UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERCEPTRON, INC.,

          Plaintiff,

                  CIVIL CASE NO. 05-40117

v.

SILICON VIDEO, INC., and PANAVISION   HONORABLE PAUL V. GADOLA
IMAGING, L.L.C.,            U.S. DISTRICT COURT

          Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO TRANSFER**

    This is a declaratory action, in diversity, under M.C.R. §§ 2.605 and 2.111 by which Plaintiff Perceptron, Inc. ("Perceptron") seeks to hold Defendants Silicon Video, Inc. ("SVI") and Panavision Imaging, L.L.C., ("Panavision") liable for an arbitration award granted to Perceptron against Photon Vision Systems, Inc. ("PVS") who is not a party to the lawsuit. Before the Court is Defendants' motion to dismiss or transfer, filed May 3, 2005. Defendants seek to have this action dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) or, in the alternative, transferred to the Northern District of New York pursuant to 28 U.S.C. § 1404(a). For the following reasons, the Court will deny the motion to dismiss and grant the motion to transfer.

**I.  Background**

    Perceptron and PVS entered into a "License and Development Agreement" on July 27, 1998. The agreement was for PVS to supply Perceptron with certain digital imaging equipment, PVS's work product created in connection with the equipment, an exclusive license to manufacture and sell the equipment, and various services related to PVS's obligation to deliver the equipment. As

compensation, Perceptron agreed to pay PVS the normal license fee and various scheduled payments. Perceptron initially paid PVS $550,440.00 for the development of the digital imaging equipment. PVS, however, failed to uphold its end of the bargain and on April 17, 2002, Perceptron sent PVS a "Notice of Termination," alleging that PVS had breached the agreement, and began settlement negotiations through subsequent correspondence.

On September 23, 2002, PVS borrowed approximately $1.75 million from Cayuga Venture Fund, L.L.C. and other lenders (collectively, "Cayuga"). As security, PVS granted Cayuga an interest in nearly all of PVS's assets. PVS stopped making payments to Cayuga in January of 2003. Cayuga declared PVS in default on February 25, 2003.

On March 27, 2003, Cayuga assigned its rights in PVS's assets to SVI, which was incorporated only days earlier on March 21, 2003. PVS then transferred all of its assets to SVI and ceased normal business operations. It was agreed by all involved that PVS's transfer of assets to SVI satisfied PVS's debt to Cayuga in full. Then, in December 2003, SVI sold all of its assets, which included PVS's former assets, to Panavision and ceased its normal business operations.

In July 2003, well after Cayuga had foreclosed on PVS, Perceptron filed an arbitration demand against PVS in New York, in accordance with the agreement. On March 24, 2004, the American Arbitration Association issued an award to Perceptron against PVS for breach of their agreement. The award included $550,440.00, the sum Perceptron paid to PVS for which it did not receive any benefit, $1,454,557.43 for wasted expenses, and $857,300.00 for costs and additional expenses incurred to acquire replacement parts. The arbitrator made the award based on the sworn affidavits of Perceptron's officers because PVS failed to appear or plead in response to the arbitration demand. On April 1, 2004, Perceptron filed an action in the Circuit Court for the County

of Wayne, Michigan to confirm the award against PVS. On March 15, 2003, Perceptron was granted a judgment confirming the award against PVS. Perceptron then filed this action in Wayne County Circuit Court on March 14, 2005, seeking to hold SVI and Panavision liable for the judgment under the theory of corporate successor liability. On April 12, 2005, Defendants removed the action to this Court based on diversity jurisdiction.

Perceptron is a Michigan corporation with its principal place of business in Michigan. SVI is a Delaware corporation with its principal place of business in New York, and Panavision is a limited liability company and a citizen of both Delaware and New York. PVS, who is not a party to this action, is a Delaware corporation with its principal place of business in New York.

## II.     Motion to Dismiss

The plaintiff bears the burden of establishing in personam jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). To satisfy this burden, "plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has [personal] jurisdiction." *Id*. (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974)).

Where the jurisdictional issue is decided pursuant to Federal Rule of Civil Procedure 12(b)(2) without an evidentiary hearing and solely on the basis of written materials, the plaintiff is only required to make a prima facie showing of jurisdiction. *Theunissen*, 935 F.2d at 1458. The pleadings are considered in a light most favorable to the plaintiff and the court does not weigh controverting assertions of the party seeking dismissal. *Id*. at 1459.

In diversity cases, such as the instant case, courts look to the law of the forum state to determine whether personal jurisdiction exists. *Nationwide Mutual Ins. Co. v. Tryg Int'l. Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996). Under Michigan law, the determination of in personam

jurisdiction over a nonresident defendant requires a two-part analysis. *Jeffrey v. Rapid American Corp.*, 448 Mich. 178, 529 N.W.2d 644 (1995). First, plaintiff must demonstrate that the exercise of in personam jurisdiction is consistent with the requirements of Due Process under the Fourteenth Amendment of the Constitution of the United States. *Id*. at 648-49. Second, plaintiff must show that the defendant falls within the reach of Michigan's long-arm statute. *Id*. The analysis "begin[s] by examining the relevant Due Process considerations, recognizing that a defect of this type would foreclose the exercise of personal jurisdiction even where a properly construed provision of the long-arm statute would permit it." *Theunissen*, 935 F.2d at 1458.

Under Michigan law, a predecessor corporation's contacts with the forum state can be imputed to its successor corporation for the purposes of determining the surviving corporation's susceptibility to personal jurisdiction. *See Jeffrey*, 448 Mich. at 198. Defendants do not dispute that this Court has personal jurisdiction over non-party PVS. Reply at 2. Rather, they dispute whether PVS's contacts with Michigan can be imputed to Defendants as corporate successors. Defendants argue that Plaintiff's factual allegations concerning successor liability, even if assumed true, are insufficient to establish successor liability. Defendants rely on *Jeffrey*, where the Michigan Supreme Court stated, "we hold that the jurisdictional contacts of a predecessor can be imputed to a successor when the successor expressly assumes all liabilities of the predecessor and when exercise of personal jurisdiction over that defendant is reasonable." *Jeffrey*, 448 Mich. at 206. According to Defendants, *Jeffrey* stands for the rule that unless the successor corporation expressly assumes the predecessor corporation's liabilities, the jurisdictional contacts of the predecessor corporation cannot be imputed to the successor corporation.

However, *Jeffrey* did not so much lay down the rule as expand it. *Jeffrey* recognized that

there is a jurisdictional corollary to the general rule that a successor corporation which merely purchases the assets of another corporation does not thereby acquire that corporation's liabilities:

> As the law of personal jurisdiction has evolved in the dynamic environment of complex corporate mergers and interstate commercial transactions, a jurisdictional corollary to the rule concerning the express assumption of a predecessor's liability has emerged: The contacts of a constituent corporation may be attributed to the surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for the liabilities incurred by the constituent corporations. This is especially true when the surviving corporation continues the business of the absorbed constituent.

*Id.* at 190-91 (citations omitted).  Looking to an early example of this rule, the Michigan Supreme Court stated that "[*Wiles v. B.E. Wallace Products Corp.*, 25 Mich. App. 300 (1970),] stands for the proposition that the acts of a predecessor may be imputed to the successor for jurisdictional purposes under the proper circumstances.  Apparently, this includes those circumstances in which the successor expressly assumes the predecessor's liabilities."  *Jeffrey*, 448 Mich. at 192 (footnote omitted).  After a thorough analysis of case law, the *Jeffrey* Court came to a conclusion:

> We hold that the actions of a constituent corporation may be attributed to a surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities allegedly incurred by the constituent corporation.  While we are cognizant that this rule is typically applied to corporations that are the present corporate embodiment of the predecessor, we find the rule equally applicable when a corporation expressly assumes the liabilities of its predecessors.

*Id.* at 198 (footnote omitted).  This holding does not require that the successor corporation expressly assume the liabilities of its predecessor before the predecessor's contacts can be imputed to it.  The rule already applied to those corporations which were the "present corporate embodiment of the predecessor."  *Id.*  The Michigan Supreme Court expanded the rule to those corporations that expressly assume the liabilities of their predecessors.  This was the result of the facts before the *Jeffrey* Court:

> The business organizations involved in *Wiles* were directly related. This is to say that the successor corporation carried on the business of the proprietorship and was, therefore, the present corporate embodiment of the predecessor. The twist in the case at bar is that Glen Alden itself did not carry on the business of old Carey. Rather, it voluntarily assumed all the assets and liabilities of old Carey and then immediately transferred them to new Carey, a wholly owned subsidiary. Thus, the question is whether the fact that Glen Alden did not carry on the business of old Carey negates its express assumption of old Carey's liabilities.

*Id.* at 192.  Here, however, Perceptron alleges that Defendants are carrying on the business of PVS and that Defendants are the present corporate embodiment of PVS.  Perceptron alleges that PVS and Defendants are all involved in the research and development of digital imaging technology; Defendants have the same corporate address, which is also the same corporate address used by PVS; Defendants advertise PVS's former products, employ PVS's former personnel, conduct themselves as PVS had done, and hold themselves out as the continuation of PVS.

The task before the Court, then, is to determine if Plaintiff's allegations are sufficient to establish that Defendants are the present corporate embodiment of PVS.  To do so, the Court must look to those facts which underlie Defendants' potential for successor liability:

> [T]he similarity of issues underlying jurisdiction and liability inescapably leads to the conclusion that theories of liability are useful in determining whether the jurisdictional contacts of a predecessor may be imputed to a successor. . . .  In the final analysis, each case presents only one set of facts and those facts must be used to establish both jurisdiction and liability if plaintiff is to be successful.

*Id.* at 198.

There is some uncertainty regarding the applicable rule for successor liability in Michigan. In *Turner v. Bituminous Casualty Co.*, 397 Mich. 406 (1976), the Michigan Supreme Court adopted three guidelines for determining whether there is a continuity between an alleged successor corporation and the predecessor corporation whose assets were purchased for cash.  The guidelines were adopted from *Shannon v. Samuel Langston Co.*, 379 F. Supp. 797 (W.D. Mich. 1974):

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> \* \* \*
>
> [2] The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> [3] The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 801 (citing *McKee v. Harris-Seybold Co., Div. of Harris-Intertype Corp.*, 109 N.J. Super. 555, 563-67 (1970), *aff'd* 118 N.J. Super. 480 (1972)).  While the third factor noticeably involves an examination of whether the purchasing corporation assumed the liabilities of the seller corporation, the Michigan Supreme Court stated that "there may be a cause of action where the totality of the transaction demonstrates a basic continuity of the enterprise." *Turner*, 397 Mich. at 411.  "If there is such continuity, then the transferee must accept the liability with the benefits." *Id.* at 430.  Nevertheless, the Michigan Supreme Court adopted the guidelines in *Turner* as a result of the underlying policy considerations involved in products liability actions, namely, the policy that manufacturers are better suited to bear the risk of defective products and the products liability rule of continuity. *Id.* at 416-29.  The Turner Court concluded that, for the purposes of products liability, "there is no basis for treating a purchase of corporate assets different[ly] from a de facto merger." *Id.* at 423.  The traditional rule, on the other hand, is a creature of corporate law:

> We recently described the scope of successor liability in *Foster v Cone-Blanchard Machine Co.*  There, we observed the "traditional rule" that successor liability requires an examination of "the nature of the transaction between predecessor and successor corporations."  In a merger in which stock is exchanged as consideration, the successor corporation "generally assumes all its predecessor's liabilities."  When the successor purchases assets for cash, however, the successor corporation assumes its predecessor's liabilities *only*

7

> (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Craig v. Oakwood Hosp.*, 471 Mich. 67, 96-97 (2004) (footnotes omitted) (quoting *Foster v. Cone-Blanchard Mach. Co.,* 460 Mich. 696, 702 (1999)). "That rule developed not in response to products liability problems, but largely in the areas of creditors' protection, and of tax assessments, or, in the case of the de facto merger, in the context of shareholder rights." *Turner*, 397 Mich. at 417-18. The *Turner* guidelines were developed in response to the traditional rule's inadequacy when applied to tort law, whereas "[t]he traditional rule reflects the general policy of the corporate contractual world that liabilities adhere to and follow the corporate entity." *Foster*, 460 Mich. at 703. Thus, because the action at bar arises over a contractual dispute, rather than a defective product, the Court will apply the traditional rule.

Perceptron's allegations are sufficient to establish that the parties in question fit the fifth exception, in that SVI is merely a continuation of PVS, and Panavision is merely a continuation of PVS and SVI. Perceptron alleges that between PVS and SVI there is a continuity of physical location, in that they have the same business address; a continuity of personnel, in that a number of PVS employees became employees of SVI; a continuity of assets, in that essentially all of PVS's assets were transferred to SVI; a continuity of general business operations, in that both companies were engaged in the research and development of digital imaging products and SVI customers include former PVS customers; and a continuity of ownership, in that a number of equity investors of PVS also held equity stakes in SVI. Perceptron also alleges that, after PVS ceased its ordinary

business operations, SVI held itself out to the world as the effective continuation of PVS. Finally, Perceptron alleges that PVS is practically defunct because it is incapable of satisfying any of its outstanding liability to Perceptron.

Perceptron also alleges that between Panavision and PVS and SVI there is a continuity of physical location, in that they all have the same business address; a continuity of management, in that all three shared at least one common manager; a continuity of assets, in that all of SVI's assets–and consequently PVS's assets–were transferred to Panavision; and a continuity of business operations, in that all were involved in the research and development of digital imaging products and Panavision's customers include former SVI and PVS customers. Furthermore, Perceptron alleges that after SVI ceased ordinary business operations, Panavision held itself out to the world as the effective continuation of PVS and SVI. Finally, Perceptron alleges that there is some continuity of ownership as Cayuga continues to hold an equity position in the original PVS assets and publicly refers to Panavision as one of its portfolio companies.

The Court finds that these allegations are sufficient to establish the prima facie case of Defendants' successor liability. Thus, Defendants are the present corporate embodiment of PVS, and PVS's contacts with the forum state can be imputed to Defendants for the purpose of establishing their susceptibility to personal jurisdiction. Because Defendants concede that this Court has personal jurisdiction over PVS, the Court need not continue the analysis further. For these reasons, the Court concludes that Plaintiff has established the Court's personal jurisdiction over Defendants and, consequently, Defendants' motion to dismiss will be denied.

**III.    Motion to Transfer**

Because the Court finds that Defendants are subject to personal jurisdiction in this forum,

Defendants move the Court to transfer the case to the Northern District of New York.  Defendants argue that such a transfer would further the convenience of the parties and be in the interest of justice.

Even if venue is proper, a district court can transfer venue "[f]or the convenience of parties and witnesses [and] in the interest of justice." 28 U.S.C. § 1404(a).  Under § 1404(a), the Court may transfer a civil action to "any other district or division where it might have been brought." *Id.*  In making this decision, the Court must determine (1) whether the action could have been brought in the proposed transferee district, (2) whether a transfer would promote the interests of justice, and (3) whether a transfer would serve the parties' and witnesses' convenience. *United States v. P.J. Dick Inc.*, 79 F. Supp. 2d 803, 806 (E.D. Mich. 2000) (Gadola J.).

Courts have broad discretion to grant or deny a motion for transfer of venue under 1404(a). *Overland, Inc. v. Taylor*, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000) (Gadola, J.) (citing *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989)).  The moving party bears the burden of demonstrating that, in light of these factors, "fairness and practicality strongly favor the forum to which transfer is sought." *Thomas v. Home Depot U.S.A., Inc.*, 131 F. Supp. 2d 934, 936 (E.D. Mich. 2001) (quoting *Rowe v. Chrysler Corp.*, 520 F. Supp. 15, 16 (E.D. Mich. 1981)).  The moving party must make this showing by a preponderance of the evidence. *Amphion Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d. 943, 946-47 (E.D. Mich. 2003) (Gadola, J.) (citing *Thomas*, 131 F. Supp. 2d at 936; *Int'l Union, U.A.W. v. Aluminum Co. of Am.*, 875 F. Supp. 430, 433 (N.D. Ohio 1995)).

In this case, the action could have been brought in the Northern District of New York because it is the principal place of business of both Defendants.  28 U.S.C. § 1391(a)(1).  The

question remains whether a transfer is in the interests of justice and whether it would be in the convenience of the parties and witness.  Factors relevant to this determination include,

> (1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Overland*, 79 F. Supp. 2d at 811 (quoting *Pilates, Inc. v. Pilates Institute, Inc.*, 891 F. Supp. 175, 183 (S.D.N.Y. 1995)).

While the Court is cognizant of the weight that must be accorded Perceptron's choice of forum, this action is, at its most, a declaratory action which seeks to have Defendants declared the successors in interest to PVS, and liable for the New York arbitration award and the Michigan judgment confirming the award.  *See* Compl. at 8.  Consequently, the majority, if not all, of the evidence will concern the transactions between PVS and Defendants and whether Defendants are the successor corporations to PVS.  The majority of witnesses will be associated with Defendants or PVS and the majority of the non-testimonial evidence will belong to Defendants or PVS.  Because the Defendants and PVS are located in New York, nearly all of the relevant evidence is too.  Federal courts have considered convenience of the witnesses to be "probably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer under 28 U.S.C. § 1404(a)." *McNic Oil & Gas Co. v. Ibex Resources Co.*, 23 F. Supp. 2d 729, 737 (E.D. Mich. 1998) (Gadola, J.) (citing Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3851). Perceptron does not seek to have the dispute underlying the arbitration award litigated, only the liability of Defendants with respect to that award.  Therefore, the convenience of witnesses, the

11

location of relevant documents and relative ease of access to sources of proof, the locus of the operative facts, the availability of process to compel the attendance of unwilling witnesses, and the trial efficiencies and the interests of justice all favor litigating this action in New York. Thus, the Court will grant Defendants' motion to transfer.

**IV.    Order**

Accordingly, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss or transfer [docket entry 2] is **DENIED** with respect to its request to dismiss for lack of personal jurisdiction and **GRANTED** with respect to its request to transfer to a more convenient forum.

**IT IS FURTHER ORDERED** that this action shall be transferred to the United States District Court for the Northern District of New York.

**SO ORDERED.**


Dated:   March 29, 2006            s/Paul V. Gadola
                                   HONORABLE PAUL V. GADOLA
                                   UNITED STATES DISTRICT JUDGE

Certificate of Service

I hereby certify that on  March 29, 2006  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
           Matthew J. Bredeweg; Michael J. Lavoie; Todd R. Mendel         , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                                                                                  .


                                                                Ruth A. Brissaud, Case Manager
                                                                (810) 341-7845